# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 27, 2013 at Knoxville

## STATE OF TENNESSEE v. EDY CHAVEZ PANTALEON

**Appeal from the Criminal Court for Davidson County**
**No. 2003-C-2104      Cheryl A. Blackburn, Judge**

---

**No. M2012-00575-CCA-R3-CD - Filed April 25, 2013**

---

The defendant, Edy Chavez Pantaleon, appeals his Davidson County Criminal Court jury convictions of rape of a child and aggravated sexual battery, claiming that the evidence was insufficient to support the convictions. In addition, the defendant argues that the trial court erred by instructing the jury on flight and that the sentence imposed by the trial court is excessive. Upon our review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Emma Rae Tennent (on appeal); and Mary Kathryn Harcombe and Chad Hindman (at trial), Nashville, Tennessee, for the appellant, Edy Chavez Pantaleon.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Kristen Menke and Sharon Reddick, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On August 29, 2003, the Davidson County grand jury charged the defendant with four counts of rape of a child and six counts of aggravated sexual battery, alleging sexual abuse inflicted on his eight-year-old great-niece, M.A.L.,[1] between January 1, 2003, and April 10, 2003. In October 2010, the defendant was arrested in Michigan, following a routine traffic stop when the arresting officer ran a nationwide criminal history search and discovered that the defendant had outstanding warrants in Tennessee. The defendant was

---

[1]As is the policy of the court, we refer to the minor victim by her initials.

returned to Tennessee, and he pleaded not guilty to all charges on November 10, 2010. The trial court conducted a jury trial in October 2011.

The victim, who was 16 at the time of trial, testified that the defendant was married to her father's aunt and that, prior to the events of 2003, the victim's relationship with the defendant was "really good" and that he "treated [her] as his daughter." The defendant lived in Nashville with his wife, his two young daughters, and his stepson, Edwin. The victim stated that their two families were very close and visited one another often.

She testified that the first incident of abuse occurred when she was at the defendant's house to play with his daughters, her cousins. The defendant told the victim to accompany him to take the trash to the dumpster in their apartment complex. They drove to the dumpster in the defendant's grey van, and after disposing of the trash, the defendant parked the van. He asked the victim if she had "ever seen a male's private part and stuff like that and if [she] wanted to see one," and the victim responded no to all of his questions. She stated that he then pulled his pants down, exposing his penis, and forced her to touch his penis with her hand. The victim testified that the defendant rubbed his hands over her breasts on top of her clothes and that he put his hands inside her pants and attempted, unsuccessfully, to "finger" her. The victim cried and told the defendant that she was going to tell her father what he had done to her, and she stated that the defendant responded, "[I]f you do that, you will never see them [sic] again." The victim attempted to exit the van but was unable to because it was locked. She stated that the defendant eventually drove the victim home.

The victim testified that the second incident of abuse occurred after she attended the state fair with the defendant, his wife, and her two young cousins. Following the fair, they drove to a house where the defendant's wife worked as a housekeeper. The defendant told the victim to get out of the car and come with him to feed the dogs. As the defendant and the victim were returning to the car, the defendant stopped her inside a fenced-in area near the swimming pool. She stated that he "started kissing all of my upper area, like my chest and my breasts and stuff." The defendant pulled the victim's shorts down and "put his hand in" her vagina, causing her pain. The victim testified that the defendant attempted to penetrate her with his penis but was unable to because they were both standing. She stated that his penis did come into contact with her vagina, explaining that his penis "was just touching and trying to like basically get shoved up there." The victim repeatedly asked the defendant to stop, but he "kept on repeating that [she] couldn't say anything because [she] would not see [her] parents again, starting with [her] dad."

The victim eventually revealed the abuse to a school friend after watching a video at school on sexual assault. The victim's friend told the school counselor, who contacted the Tennessee Department of Children's Services ("DCS"). From that point

forward, the victim had no further contact with the defendant or his family.

On cross-examination, defense counsel questioned the victim regarding some discrepancies between her trial testimony and the notes from her conversation with a DCS case worker in 2003, in which some instances of sexual abuse are attributed to the defendant's stepson, Edwin. Specifically, counsel noted that the DCS notes indicated that the victim identified Edwin as the perpetrator of the previously-described second incident of abuse. The victim responded that the notes were incorrect and that, in 2003, she had attributed the abuse to the defendant. She further stated that Edwin was not with them when that incident of abuse occurred.

The victim's father, Henry Lopez, testified that, after he learned of the abuse, the defendant came to his house for a haircut. Mr. Lopez asked the defendant if he had something to tell him.

> And [the defendant] told me yes. And he walked towards my
> bedroom. In my bedroom he got on his knees and started to cry.
> And he said, forgive me. And I asked him why he had done it.
> And I asked him again why he had done it. It's my daughter,
> she's a child. He said, forgive me, I don't know what happened,
> but I didn't hurt her.

Shortly after this admission, Mr. Lopez requested that the defendant meet with him, the defendant's wife, and members of their church clergy for the defendant to admit to his wife what he had done. At that meeting, the defendant told his wife "that he had touched" the victim, causing the wife to have "a breakdown." Mr. Lopez admitted that the defendant never specified what he had done to the victim, and Mr. Lopez stated that he did not ask because he did not want to know.

Officer Rafael Fernandez with the Metro Nashville Police Department ("Metro") testified that in July 2003 he was a patrol officer and assisted Detective Ken Potter in the investigation of the defendant by serving as an interpreter during the defendant's July 9, 2003 interview. Officer Fernandez acknowledged that he was not a certified interpreter but stated that he had no trouble understanding and interpreting for the defendant. When asked whether any confusion occurred in translating the questions regarding the digital penetration of the victim, Officer Fernandez responded, "No, no. In my opinion there was no confusion at all. He demonstrated what finger and up to what point he believes – how deep he inserted that finger when it came to things like that." He further stated that the defendant "actually indicated on his finger. That's how come I was able to say about a quarter inch because that's what he indicated on his middle finger."

Marcus Ellis testified that, in April 2003, he was the DCS investigator assigned to the victim's case, and he interviewed the victim at her school on the same date she disclosed the abuse to her school counselor. Mr. Ellis stated that he was also present at the police station when the defendant was interviewed, and he recalled that the defendant admitted to sexually abusing the victim, "telling [those present] how he did it and what he did."

Metro Detective Ken Potter testified that, when he interviewed the defendant on July 9, 2003, he made it very clear that the defendant was not under arrest and that he was free to leave at any time. When asked if the defendant had admitted digitally penetrating the victim, Detective Potter responded in the affirmative and stated that the defendant "showed [Detective Potter] the hand he used, the finger he used, and how far he penetrated the [victim]."

The defendant testified through an interpreter and denied ever raping or sexually assaulting the victim. When asked why he had admitted to the police that he had raped and assaulted the victim, the defendant stated that he was afraid because he had never been in any kind of trouble. He testified that he apologized to Mr. Lopez "because [he] felt like [he] had made a mistake by saying thing that is weren't true [sic]." On cross-examination, the defendant admitted that he left Tennessee "because [he] was afraid" and because he "had never been in this kind of trouble before."

Before the case was sent to the jury, the trial court directed a verdict of not guilty on one count of rape of a child, and, at the request of the State, two other counts of rape of a child were dismissed. The jury convicted the defendant of one count of rape of a child, based on the incident of digital penetration near the swimming pool, and two counts of aggravated sexual battery, one based on the defendant's rubbing the victim's breasts on top of her clothing while inside his van and the second based on the defendant's pulling down the victim's shorts and kissing her breasts while near the swimming pool. The jury was unable to reach a verdict on the other four counts of aggravated sexual battery, and those charges were later dismissed by the State.

At the sentencing hearing, the defendant elected to be sentenced pursuant to the pre-2005 sentencing laws. The court considered the evidence from both the trial and the sentencing hearing, the presentence report, the principles of sentencing, enhancement and mitigating factors, and the statement of the defendant. The court noted that, under the prior law, the only available enhancement factor was history of criminal convictions or behavior, and the court found that the defendant's one prior misdemeanor conviction of assault was not enough to alter the sentencing range. The trial court also noted that, by statute, all three sentences had to be served at 100 percent. On the two aggravated sexual battery convictions,

the court sentenced the defendant to eight years, the statutory minimum. With respect to the conviction of rape of a child, the court noted that 20 years was the starting point for sentencing but that the sentence could be reduced if mitigating factors existed. The court examined all mitigating factors and determined that none were applicable, with the possible exception of the catchall, "[a]ny other factor consistent with the purposes of this chapter." *See* T.C.A. § 40-35-113(13) (1997). The court examined the applicability of this factor and found as follows:

> And what [defense counsel] has put forward is the fact that while [the defendant] was in Michigan after he left this jurisdiction – because he testified he left after he talked to the police because he was afraid – that he le[d] a law abiding life. Well, quite honestly all people are expected to live a law abiding life. So there's really no mitigating factors that apply in this case to reduce the sentence below twenty years.

The trial court ordered all three sentences to be served consecutively, for a total effective sentence of 36 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant argues that the evidence was insufficient to support his convictions, that the trial court improperly instructed the jury on the law of flight, and that the sentence imposed was excessive. We consider each claim in turn.

## I. Sufficiency

The defendant first asserts that the evidence adduced at trial was insufficient to support his convictions, claiming that because the victim's original statement to DCS case worker Marcus Ellis did not describe all of the incidences of abuse that she testified about at trial, her trial testimony was too inconsistent to establish his guilt beyond a reasonable doubt. The State contends that the evidence supported the verdict of the jury.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379

(Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (1997). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7). Aggravated sexual battery, as charged in this case, "is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . The victim is less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4). "Sexual contact" is defined as including "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Finally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

Here, the victim testified that the defendant "put his hand in" her vagina, causing her pain. Both Officer Fernandez and Detective Potter testified that the defendant, when interviewed, demonstrated which finger he used and how far he penetrated the victim with that finger. As to the evidence of aggravated sexual battery, the victim testified that the defendant, during the first incident of abuse, rubbed his hands over her breasts on top of her clothes while they were sitting inside the defendant's van, and, during the second incident of abuse, the victim testified that the defendant pulled down her shorts and kissed "all of [her] upper area." This evidence supports the defendant's convictions of rape of a child and aggravated sexual battery.

The defendant argues that the inconsistencies between the victim's trial testimony and her statements to Mr. Ellis were too significant to support a finding of guilt beyond a reasonable doubt. Specifically, the defendant points to the fact that the incident in

the defendant's van was not included in the DCS report and that the report indicates that the rape and sexual assault near the swimming pool were perpetrated by the defendant's stepson, Edwin. We disagree with the defendant on this point. Defense counsel cross-examined the victim about these inconsistencies at trial. The victim testified that the DCS report was inaccurate and that she had identified the defendant, and not his stepson, as the perpetrator near the swimming pool. Further, the victim acknowledged that her account of the incident in the van was not included in the DCS report, but she testified that it did occur. These matters of witness credibility and evidentiary weight are within the exclusive province of the trier of fact, and this court will not re-weigh such evidence. *See Dorantes*, 331 S.W.3d at 379.

The defendant also takes issue with the victim's statement that the second incident of abuse occurred after she attended the state fair with the defendant and his family. Noting that the indictment alleges that all offenses occurred between January 1, 2003, and April 10, 2003, the defendant posits that the state fair takes place in late summer and asks this court to take judicial notice of this "commonly held knowledge." This we cannot do. First, the defendant had the opportunity to cross-examine the victim at trial about this alleged inconsistency and failed to do so. Second, the defendant has provided this court with no evidence or factual data to support his contention regarding the dates of the state fair. Finally, to take judicial notice of this fact would be tantamount to judging the credibility of the victim and substituting our judgment on a factual matter for that of the jury. *See id.*

We find that the State presented sufficient evidence to support the defendant's convictions of rape of a child and aggravated sexual battery.

*II. Jury Instruction on Flight*

The defendant asserts that the trial court erred by instructing the jury on flight, contending that there was insufficient evidence to warrant such an instruction. The State argues that the instruction was justified.

During discussion of the proposed jury instructions in the instant case, the State requested that the trial court provide the standard jury instruction on flight. The defense objected, noting that there was no indiction in the trial testimony as to when the defendant moved to Michigan or that he moved to avoid prosecution. The trial court disagreed, pointing out that the defendant testified that he left the state because he was afraid. On that basis, the trial court ruled that the flight instruction would be included.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see also* Tenn.

-7-

R. Crim. P. 30. To properly charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction. *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence supporting such instruction requires "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion or concealment in the community.'" *State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989) (*quoting Rogers v. State*, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970) (citing 22A C.J.S. Criminal Law § 625)). Our supreme court has held that "[a] flight instruction is not prohibited when there are multiple motives for flight" and that "[a] defendant's specific intent for fleeing a scene is a jury question." *Berry*, 141 S.W.3d at 589.

In this case, the evidence established that sometime after the defendant met with police and confessed to raping the victim, he left Tennessee and moved to Michigan. By his own admission, he made no effort to contact the authorities in Tennessee. His whereabouts remained undetected until his traffic stop and subsequent arrest in Michigan in October 2010, when Michigan authorities learned that he had an outstanding arrest warrant in Tennessee. The defendant admitted at trial that he left Tennessee out of fear. Under these circumstances, the trial court did not err by providing an instruction on flight.

### III. Sentencing

In his final issue, the defendant challenges the trial court's imposition of sentence. He contends that the trial court erred in failing to apply two mitigating factors, resulting in an excessive sentence, and that the trial court should not have ordered consecutive service of the sentences. The State argues that the record supports the sentencing decision in this case.

### A. Length of Sentence

Because the defendant elected to be sentenced for his pre-2005 crime under the terms of the Sentencing Act prior to the 2005 amendments, we review his challenge to the sentence under our previous standard of review. Under that standard, when considering a challenge to the length, range, or manner of service of a sentence, this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (1997). The presumption of correctness "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Carter*, 254 S.W.3d at 344; *Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and

proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In the instant case, the defendant argues that the trial court's refusal to find any mitigating factors resulted in an excessive sentence for his conviction of rape of a child. The defendant asserts that the trial court should have applied mitigating factor one, that the defendant's conduct neither caused nor threatened serious bodily injury, as well as factor 13, which permits courts to consider any other factors consistent with the purposes of the sentencing act. *See* T.C.A. § 40-35-113(1), (13). With respect to factor one, our supreme court has stated that "[e]very rape or sexual battery offense is physically and mentally injurious to the victim." *State v. Kissinger*, 922 S.W.2d 482, 487 (Tenn. 1996). Moreover, this court has stated, "It is difficult to conceive of any factual situation where the rape of a child would not *threaten* serious bodily injury." *State v. Edward Earl Huddleston*, No. 02C01-9706-CC-0028, slip op. at 5 (Tenn. Crim. App., Jackson, Feb. 20, 1998), *perm. app. denied* (Tenn. Oct. 19, 1998). This court has further held that serious bodily injury encompasses an element of mental harm as well. *See State v. Daniel Ross McClellan*, No. E2010-02338-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Knoxville, June 21, 2012), *perm. app. denied* (Tenn. Nov. 27, 2012). Here, the victim, who was only eight years old at the time of the offenses, testified that the defendant caused her pain when he digitally penetrated her. Moreover, in her victim impact statement, the victim emphasized the mental anguish caused by the defendant's conduct, stating that she had developed eating disorders and suffered from low self-esteem and an inability to trust people. Given this testimony, we find this mitigating factor to be inapplicable.

The defendant also contends that the trial court should have applied factor 13 on the basis that the defendant has been a "model inmate during his incarceration." In support of this assertion, the defendant relies on his own testimony at the sentencing hearing, in which he pointed out that he had two jobs in prison, that he had no disciplinary problems, and that he helped others inmates. The defendant notes that this court has previously found factor 13 to be applicable when a defendant has been a "model inmate" while incarcerated. *See State v. David Christian Russell*, No. M1999-00202-CCA-R3-CD, slip op. at 11 (Tenn. Crim. App., Nashville, July 27, 2000). The defendant's reliance on this case, however, is misplaced. At the sentencing hearing in *David Christian Russell*, a law enforcement officer testified that the defendant "had no write-ups or violations of rules or regulations and never complained." *Id.* at 4. In the instant case, the defendant offered nothing in support of his good behavior other than his own self-serving testimony. As such, we find no error in the

trial court's refusal to apply this mitigating factor, nor do we find error in the resulting 20-year sentence for the conviction of rape of a child.

## B. Consecutive Sentencing

Finally, the defendant argues that the trial court erred in ordering his sentences to be served consecutively, for an effective sentence of 36 years' incarceration. Code section 40-35-115 provides criteria for which a trial court may impose consecutive sentences on a defendant:

> (b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
>
> . . . .
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

T.C.A. § 40-35-115(b)(5) (1997). A trial court may apply factor (5) if the record supports a finding of that factor's factual considerations by a preponderance of the evidence. *See id.* "Sentences shall be ordered to run concurrently, if the criteria noted [in T.C.A. § 40-35-115(b)] are not met, unless consecutive sentences are specifically required by statute or the Tennessee Rules of Criminal Procedure." *Id.* § 40-35-115(d). The operative language of Code section 40-35-115(b)(5) originated in *State v. Taylor*, 739 S.W.2d 227 (Tenn. 1987), and was later codified in the 1989 Sentencing Act. In *Taylor*, our supreme court cautioned "that consecutive sentences should not routinely be imposed in sexual abuse cases . . . and that the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved." *Id.* at 230. Similarly, the Sentencing Act provides that "[e]very defendant shall be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." *Id.* § 40-35-102(1). In addition, Code section 40-35-103 provides that sentences "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(2), (4). In *Gray v. State*, 538 S.W.2d 391 (Tenn. 1976), our supreme court held that consecutive sentencing should only be imposed after a finding that extended confinement "is necessary to protect the public from further criminal

conduct by the defendant." *Id.* at 393. The holding in *Gray*, like that in *Taylor*, was later codified in the 1989 Act.

In applying Code section 40-35-115(b)(5), the trial court found as follows:

> Factor number five does apply, that he has been convicted of two or more statutory offenses involving sexual abuse of a minor . . . . And . . . the relationship, she considered him her uncle. . . . The timespan of the undetected sexual activity, which was hard to determine, but it wasn't just a few days. It was considerable. The nature and scope of the sexual acts and the – those would be both touching both breasts, genital area, there was a rape involved in that. The extent of the residual physical or mental damage to the victim, she testified in her statement about she developed an eating disorder. I remember her testimony about him telling her that if you tell anyone you'll never see your parents again. She testified how he was supposed to take care of me, so there is a violation of trust in this situation. So here is somebody who is her caretaker at times and then abused her in ways and then threatened if she tells that she would never see her parents again. So all of those factors make this a situation for which consecutive sentences are appropriate.

We agree with the trial court's reasoning regarding the defendant's abuse of his position of trust as the victim's great-uncle. We cannot say that the time span of the sexual activity was "considerable," as found by the trial court. The victim testified to three distinct instances of sexual abuse, and the jury did not convict the defendant on the counts related to one of those instances. The nature and scope of the sexual activity, in view of the victim's age, was not benign. As to the evidence of residual mental damage, the victim testified that the abuse caused eating disorders, low self-esteem, and issues with trust. Taking all of this into consideration, we hold that the trial court's order of total consecutive sentencing is supported in the record.

*IV. Conclusion*

In consequence of the above analyses, we affirm the defendant's convictions and sentences.

-11-

_____
JAMES CURWOOD WITT, JR., JUDGE